147 T.C. No. 2

UNITED STATES TAX COURT

CGG AMERICAS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25097-10.                    Filed July 21, 2016.

P conducted marine surveys of the outer continental shelf in the Gulf of Mexico. The surveys employed geophysical techniques, such as seismic reflection, for detecting the presence of oil and gas. P licensed the data from the surveys to its customers on a nonexclusive basis. P's customers used the data to drill for oil and gas on the outer continental shelf in the Gulf of Mexico. R contends that the expenses P incurred in conducting the surveys were not "geological and geophysical expenses paid or incurred in connection with the exploration for, or development of, oil or gas" within the meaning of I.R.C. sec. 167(h).

<u>Held</u>: "[G]eological and geophysical expenses" are not limited to expenses incurred by taxpayers that own oil and gas interests.

<u>Held</u>, <u>further</u>, the expenses P incurred to conduct its surveys were incurred "in connection with the exploration for, or development of, oil or gas" and so are deductible under I.R.C. sec. 167(h).

Allen Duane Webber, Thomas V. Linguanti, Summer M. Austin, Sonja Schiller, and Phillip J. Taylor, for petitioner.

Dennis M. Kelly, Robert M. Morrison, and Shelia Dansby Harvey, for respondent.

OPINION

MORRISON, Judge:  We will grant the motion for summary judgment filed by the petitioner, CGG Americas, Inc. ("CGGA"), on July 23, 2012.  We will deny the cross-motion for summary judgment filed by the respondent (the "IRS") on July 25, 2012.

The IRS issued a notice of deficiency to CGGA determining income-tax deficiencies of $419,233 for the tax year 2006 and $2,806,961 for the tax year 2007.  CGGA filed a petition with the Court seeking redetermination of the deficiencies, as permitted by section 6213(a).[1]  The Court has jurisdiction to redetermine the deficiencies under section 6214.

Before filing the motion and cross-motion for summary judgment, the parties executed a stipulation of facts.  After concessions by the parties, the only

---

[1]Unless otherwise indicated, all "section" references are to the Internal Revenue Code, as in effect for 2006 and 2007.

issue remaining for decision is whether the expenses CGGA incurred to conduct certain marine surveys and to process data from the surveys are deductible under section 167(h). Section 167(h)(1) provides: "Any geological and geophysical expenses paid or incurred in connection with the exploration for, or development of, oil or gas within the United States (as defined in section 638) shall be allowed as a deduction ratably over the 24-month period beginning on the date that such expense was paid or incurred." We hold that the expenses are deductible under section 167(h).

## Background

The background of this case is drawn from the stipulation of facts and the exhibits attached to it.

### Corporate structure of the petitioner

CGGA is a corporation organized under the laws of Texas. During 2006 and 2007 (the tax years at issue), CGGA was a wholly owned subsidiary of Compagnie Générale de Géophysique-Veritas, S.A., a French corporation. For each of the tax years at issue, CGGA filed corporate tax returns with an IRS office in Utah. CGGA was a calendar year, accrual-method taxpayer. In August 2010, the IRS issued the notice of deficiency to CGGA. Later the same month, CGGA merged with and into CGGVeritas Services (U.S.), Inc., a corporation organized

under the laws of Delaware (and referred to here as "CGGVeritas"). In November 2010, the petition was timely filed--under the name "CGGA C/O CGGVeritas". When the petition was filed, the principal corporate offices of CGGVeritas were in Houston, Texas.

The survey expenses

CGGA conducted marine surveys of the outer continental shelf in the Gulf of Mexico. The surveys involved the use of geophysical techniques that detected or suggested the presence of oil and gas in the area surveyed.

One geophysical technique used by CGGA in the surveys was seismic reflection, which is the measurement of the two-way travel time of seismic waves from the ocean's surface to various depths in the Earth's subsurface.[2] Boats would tow submerged arrays of pneumatic chambers that had been pressurized with compressed air.[3] At regular intervals, the chambers were triggered to produce pulses of sound energy. The sound waves generated by this process traveled through the solids, liquids, and gases that made up the geological formations in the substructure of the ocean floor, were reflected back to the water surface, and were

---

[2] The stipulation of facts suggests that seismic reflection is one of the geophysical techniques used in the surveys, but not the only one. The stipulation states: "CGGA acquired data during marine surveys conducted in 2006 and 2007 using geophysical techniques, such as seismic reflection, that detected or implied the presence of oil and gas in the survey area".

[3] CGGA chartered the boats used from its affiliated corporation, CGGMarine Resources AS.

captured by groups of special microphones (called hydrophones) that converted the captured sound energy into electrical impulses.

The data initially generated by the surveys was raw acoustic data. CGGA processed (and reprocessed) the raw acoustic data to create usable information such as visual representations (including maps) of geological formations in the earth's subsurface. The word "data", as used subsequently in this Opinion, refers to both the raw acoustic data and the information that resulted from processing the raw acoustic data.

CGGA licensed the data to its customers on a nonexclusive basis for a fee. CGGA's customers were companies engaged in oil and gas exploration and development. The customers used the data to:

- identify new areas where subsurface conditions were favorable for oil and gas development and production,

- determine the size and structure of previously identified oil and gas fields,

- determine how to develop oil and gas reserves and produce oil and gas,

- determine which oil and gas properties to acquire, and

- determine where to drill wells.

CGGA's customers and their competitors generally did not directly conduct the type of surveys performed by CGGA and similar companies with respect to the outer continental shelf in the Gulf of Mexico. The locations of substantially all oil and gas wells drilled on the outer continental shelf in the Gulf of Mexico were determined, in part, using data generated by CGGA and similar companies through the geophysical techniques used by CGGA in its surveys. CGGA's customers did not have a viable commercial use for the data licensed from CGGA other than the exploration, development, and production of oil and gas within the outer continental shelf in the Gulf of Mexico.

CGGA incurred various expenses to conduct the surveys and process (and reprocess) the data from the surveys. These expenses will be referred to as "survey expenses".

## Discussion

Summary judgment may be granted with respect to all or any part of the legal issues in controversy if the pleadings, stipulations and exhibits, and any other acceptable materials, together with any affidavits, show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law. Tax Ct. R. Pract. & Proc. 121(a) and (b). In evaluating CGGA's motion for summary judgment, we draw factual inferences in the manner most favorable to

the IRS (the party opposing the motion).  See Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985).

The IRS takes the position that CGGA's survey expenses were not "geological and geophysical expenses paid or incurred in connection with the exploration for, or development of, oil or gas" within the meaning of section 167(h).  See full text of section 167(h)(1) supra p. 3.  As applied to the statutory text, the IRS's position consists of two arguments.[4]  First, the IRS argues that the phrase "geological and geophysical expenses" used in section 167(h) is a term of art that refers only to expenses incurred by taxpayers that own mineral interests, that is, oil or gas interests.[5]  In the IRS's words:

> For tax purposes, the phrase refers exclusively to expenses related to the exploration for oil or gas incurred by taxpayers who are exploration and production companies or otherwise owners of mineral interests.

Observing that CGGA did not own any mineral interests, the IRS contends that the survey expenses are not "geological and geophysical expenses" as used in section

---

[4]The IRS distinguishes between the two arguments in its summary-judgment papers:  "The expenses in dispute are not 'geophysical expenses' for federal income tax purposes.  And, they were not 'paid or incurred in connection with the exploration for, or development of, oil or gas.'"

[5]The parties use the word "mineral" to include oil and gas.  Although the word "mineral" is sometimes used in a narrow sense that is limited to solid substances, a broader definition of the word includes solids, liquids, and gases extracted from the ground.  See Merriam-Webster's Collegiate Dictionary 740 (10th ed. 1997) ("5a:  a solid homogeneous crystalline chemical element or compound that results from the inorganic processes of nature; broadly: any of various naturally occurring homogeneous substances (as stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained usu. from the ground").

167(h).[6]  Second, the IRS argues that the survey expenses were not paid or

incurred "in connection with the exploration for, or development of, oil or gas".

See sec. 167(h).  As the IRS explains the argument, an expense is "paid or

incurred in connection with the exploration for, or development of, oil or gas"

within the meaning of section 167(h) only when paid or incurred "in connection

with the taxpayer's exploration for, or development, of, oil or gas", not when paid

or incurred by a taxpayer in connection with the exploration for, or development

of, oil or gas by "other taxpayers" (i.e., CGGA's customers).[7]

----

[6]Two points should be made regarding the IRS's first argument:  (1) even though the IRS contends that the survey expenses are not "geological and geophysical expenses", it does not contest that the survey expenses related to "geophysical activities" and (2) the class of taxpayer who, in the IRS's view, can incur geological and geophysical expenses is not coextensive with the class of taxpayers that own mineral interests.  Each of these points is explained below in this footnote.

(1)  The IRS has stipulated that CGGA's survey expenses were incurred for geophysical activities. (Specifically, paragraphs 34 and 35 of the stipulation state that the survey expenses "were incurred for geophysical activities".)  Consistent with this, the IRS's first argument rests not on the meaning of the word "geophysical" but on the phrase "geological and geophysical expenses", a phrase that the IRS contends is a specialized term of art in oil and gas taxation that refers only to expenses incurred by owners of mineral interests.

(2)  In its summary-judgment papers, the IRS uses various phrasings to describe the types of taxpayers that, in its view, can incur "geological and geophysical expenses" as that term is used in sec. 167(h).  The IRS contends that "geological and geophysical expenses" can be incurred only by taxpayers that variously:

- are "oil or gas producers or owners of mineral interests",
- are "exploration and production companies or otherwise owners of mineral interests",
- "own mineral interests (in fee simple or by leasehold interests) and who are directly engaged in the exploration for and/or development of mineral interests", or
- own or are "considering acquiring or retaining an interest in minerals for the purpose of exploring and/or developing the minerals".

We take the variations to mean that, in the IRS's view, only taxpayers that own (or intend to acquire) a mineral interest for the purpose of oil (or gas) exploration, development, or production can incur "geological and geophysical expenses".  Throughout this Opinion we refer to this class of taxpayers simply as "mineral-interest owners" or "taxpayers that own mineral interests".  CGGA contends that the inconsistencies in the IRS's various definitions of this class of taxpayers counsels against the IRS's proposed interpretation of sec. 167(h).  We agree with this concern.

[7]This argument contains an implicit assumption that although CGGA's survey expenses are related to exploration, the exploration was an activity of CGGA's customers, not CGGA.

Section 167(h) applies to "expenses paid or incurred in connection with the exploration for, or development of, oil or gas within the United States (as defined in section 638)". See sec. 638 ("[W]ith respect to mines, oil and gas wells, and other natural deposits--(1) the term 'United States' when used in a geographical sense includes the seabed and subsoil of those submarine areas which are adjacent to the territorial waters of the United States and over which the United States has exclusive rights, in accordance with international law, with respect to the exploration and exploitation of natural resources[.]"). The IRS does not raise a challenge regarding the geographic locations of the exploration and development to which the surveys relate.

The parties have stipulated that, if the Court determines that the survey expenses paid or incurred in 2006 and 2007 are required to be amortized under section 167(h), then CGGA is entitled (1) for 2006 to a $49,481,706 deduction with respect to survey expenses paid or incurred from 1998 through 2006, consisting of a $14,439,728 amortization deduction under section 167(h) and a $35,041,978 depreciation deduction under section 167(g), and (2) for 2007 to a $48,207,217 aggregate deduction with respect to survey expenses paid or incurred from 1998 through 2007, consisting of a $36,569,407 amortization deduction under section 167(h) and an $11,637,810 depreciation deduction under section

167(g). The parties have stipulated that, if the Court determines that the survey expenses paid or incurred in 2006 and 2007 are not required to be amortized under section 167(h), then CGGA is entitled (1) for 2006 to a $48,112,324 depreciation deduction pursuant to section 167(g) with respect to the survey expenses paid or incurred from 1998 through 2006 and (2) for 2007 to a $39,675,421 depreciation deduction pursuant to section 167(g) with respect to survey expenses paid or incurred from 1998 through 2006.[8]

1.     CGGA's survey expenses were "geological and geophysical expenses".

We first address the IRS's argument that the phrase "geological and geophysical expenses" is restricted to expenses incurred by taxpayers that own

---

[8]Sec. 167(g) provides rules to be applied if the depreciation deduction allowable under sec. 167 is determined under the income-forecast method or any similar method. The income-forecast method has been described by a treatise as follows:

> **Income forecast method.** In circumstances where the property sold is depreciable property of a type normally eligible for depreciation on the income forecast method, basis may be recovered using the income forecast method. This method may also be used where the property sold is depletable property of a type normally eligible for cost depletion in which total future production must be estimated, and payments under the contingent selling price agreement are based on receipts or units produced by or from this property.

> Under the income forecast method, the amount of basis to be recovered each year is determined by multiplying total basis by a fraction, the numerator of which is the payments (exclusive of interest) received in the year and the denominator of which is total estimated payments (exclusive of interest). For example, if the property sold is expected to produce aggregate revenue to the seller of $100 and if $10 is received by the seller in the year of sale, 10 percent of the seller's basis will be recovered in the year of sale.

> The regulations identify mineral properties, motion picture and television films, and television shows as property that may qualify for use of the income forecast method. In addition, a taxpayer may seek a ruling from the IRS as to whether the character of specific property qualifies for use of income forecast recovery of basis.

Stephen F. Gertzman, Federal Tax Accounting, para. 5.05[12][d][i], at 5-76 to 5-77 (2d ed. 1993) (fn. ref. omitted).

mineral interests. The IRS's argument is that by 2005, the year in which Congress enacted section 167(h), the phrase "geological and geophysical expenses" had taken on this restricted meaning through judicial opinions and administrative rulings and that this restricted meaning was intended by Congress when it used the phrase in section 167(h). In support of its position, the IRS relies on three sources: judicial opinions, administrative rulings, and legislative materials.

The first case the IRS cites is Thompson v. Commissioner, 9 B.T.A. 1342 (1928). This case involved a taxpayer who was "engaged in the business of buying and selling oil and gas leases in Texas, prospecting thereon for oil and gas, and in drilling oil and gas wells." Id. at 1345. One issue in the case concerned the tax treatment of $5,241 of expenses that the taxpayer had incurred for "geological surveys and opinions". Id. The Board of Tax Appeals described these expenses as a "[g]eological expense". Id. The Board held that the $5,241 of expenses, which the taxpayer had sought to deduct for the year in which incurred, were "capital expenditures to be added to the cost of acquiring the property in connection with which they are paid" because the taxpayer had not "shown that such payments were made for surveys and opinions upon tracts never purchased." Id. Although the taxpayer in Thompson owned mineral interests, and although the opinion referred to the taxpayer's expenses of geological surveys as a "[g]eological

expense", the Court did not say that the term "geological expense" is confined to expenses incurred by owners of mineral interests. See generally id. at 1345-1346.

The IRS cites another case, Louisiana Land & Expl. Co. v. Commissioner, 7 T.C. 507 (1946), aff'd on other grounds, 161 F.2d 842 (5th Cir. 1947), for the proposition that the phrase "geological and geophysical expenses" refers only to expenses incurred by owners of mineral interests. In that case the Tax Court held that the expense of a seismic survey, incurred by the holder of a mineral lease, was a capital expense and therefore was not deductible for the year the expense was incurred. Id. at 510, 516. The Court in Louisiana Land referred to the seismic survey expense as a "geophysical expense". Id. at 514, 516. However, the opinion did not define a "geophysical expense" as including only an expense incurred by owners of mineral interests.

The IRS cites other cases in support of its theory that the phrase "geological and geophysical expenses" refers only to expenses incurred by owners of mineral interests, but these cases may be more expediently discussed after three rulings that the IRS cites for the same proposition. The three rulings--I.T. 4006, 1950-1 C.B. 48, Rev. Rul. 77-188, 1977-1 C.B. 76, and Rev. Rul. 83-105, 1983-2 C.B. 51--considered the tax treatment of "geological and geophysical" costs or expenditures. The later two rulings arguably have special significance because

they are referred to in the legislative history of section 167(h) as having "provided

further guidance regarding the definition and proper tax treatment of * * *

[geological and geophysical expenditures]." See H.R. Rept. No. 109-45, at 34

(Apr. 18, 2005) (discussed infra pp. 33-34); Staff of J. Comm. on Taxation,

Description and Technical Explanation of the Conference Agreement of H.R. 6,

Title XIII, the "Energy Tax Incentives Act of 2005", JCX-60-05, at 55-57 (J.

Comm. Print July 28, 2005) (referred to here as "JCX-60-05" and discussed infra

pp. 36-38).

The first ruling, I.T. 4006, supra, clarified the tax treatment of "geological

and geophysical exploration costs".[9] Id., 1950-1 C.B. at 48-49. The ruling

introduced its subject matter as follows:

> Advice is requested whether, for Federal income tax purposes,
> geological and geophysical exploration costs constitute capital
> expenditures or ordinary and necessary business expenses.

Id. at 48. The ruling then summarized the caselaw regarding "exploration costs"

generally, stating:

> It has been held that exploration costs are capital expenditures
> and are not deductible as business expenses under section 23(a)(1)(A)

---

[9] The abbreviation "I.T." was used by the IRS as the designation of one of the types of rulings that it issued before it began issuing "revenue rulings" in 1953. Gail Levin Richmond, Federal Tax Research 207 (8th ed. 2010). "I.T." stood for "Income Tax Unit" or "Income Tax Division". 1950-1 C.B. IV; Richmond, supra, at 207, 391.

of the Internal Revenue Code[10] and corresponding provisions of prior revenue laws. (See * * * Thompson v. Commissioner, 9 B.T.A. 1342.) Such costs are incurred for the purpose of obtaining and accumulating data which will serve as a basis for the acquisition or retention of property. In this connection, the term "property" is used in the sense of "interest" in a mineral property, as provided in section 29.23(m)-1(i) of Regulations 111.[11] Accordingly, if property is acquired or retained on the basis of data obtained from exploration, costs of exploration attributable to that property should be capitalized as part of the cost of such property.

Id. at 48-49 (some citations omitted). By discussing the caselaw regarding "exploration costs" in the context of its subject matter of "geological and geophysical exploration costs", the ruling seemingly considered "geological and geophysical exploration costs" to be a subset of exploration costs. Thus, one could reasonably take the ruling to imply that "geological and geophysical exploration costs", like the larger set of "exploration costs", are incurred only "for the purpose of obtaining and accumulating data which will serve as a basis for the acquisition or retention of property." Id. at 49. This proposition is significant

---

[10]Sec. 23(a)(1)(A) of the Internal Revenue Code of 1939 allowed a deduction for ordinary and necessary expenses of a trade or business. The corresponding provision in the Internal Revenue Code of 1954 (and in the Internal Revenue Code of 1986) is sec. 162(a). Washburn v. Commissioner, 283 F.2d 839, 842 (8th Cir. 1960) (1954 Code), aff'g 33 T.C. 1003 (1960).

[11]Sec. 29.23(m)-1(i), Regs. 111, provided:

"The property," * * * means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate "property"; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property", provided such treatment is consistently followed.

because the IRS, in its summary-judgment papers, seems to suggest that a cost is incurred "for the purpose of obtaining and accumulating data which will serve as a basis for the acquisition or retention of property" only if the cost is incurred "for the purpose of obtaining and accumulating data which will serve as a basis for the acquisition or retention of property" by the taxpayer. If this suggestion is correct, "geological and geophysical exploration costs", like the larger set of "exploration costs", are incurred only by owners of mineral interests. We are not convinced of the correctness of the IRS's suggestion. A taxpayer could incur costs "for the purpose of obtaining and accumulating data which will serve as a basis for the acquisition or retention of property"--where the "property" is acquired or retained by another taxpayer. One taxpayer could obtain data; another taxpayer could use the data to determine what property to buy.

Rev. Rul. 77-188, supra, superseded I.T. 4006, supra. At the beginning of Rev. Rul. 77-188, 1977-1 C.B. at 76, was the following introductory statement:

> The questions presented concern the treatment for Federal income tax purposes of geological and geophysical exploration expenditures for the purpose of obtaining and accumulating data that will serve as a basis for the acquisition or retention of property by a taxpayer who is engaged in exploring for minerals under the circumstances described below.

The ruling then described various types of survey costs incurred by a taxpayer in order to make decisions "to acquire or retain properties". Id. at 77. The ruling opined on the tax treatment of the costs. Id. For each type of cost described in the ruling, the taxpayer in question was an owner of mineral interests. Therefore, the IRS contends, the ruling implies that "geological and geophysical exploration expenditures" included only expenditures by mineral-interest owners. We disagree. Although the ruling used the phrase "geological and geophysical exploration expenditures", the ruling did not purport to describe all types of "geological and geophysical exploration expenditures". Indeed, the introductory statement clarified that the ruling was written to apply only to a particular subset of "geological and geophysical exploration expenditures", namely, expenditures "for the purpose of obtaining and accumulating data that will serve as a basis for the acquisition or retention of property by a taxpayer who is engaged in exploring for minerals under the circumstances described below." Id. at 76.

The next ruling the IRS cites is Rev. Rul. 83-105, supra. Rev. Rul. 83-105, 1983-2 C.B. at 52 stated: "Geological and geophysical expenditures are incurred by a taxpayer for the purpose of obtaining and accumulating data that will serve as the basis for the acquisition or retention of properties for purposes of mineral recovery or to abandon an area as unworthy of development." Rev. Rul. 83-105,

1983-2 C.B. at 52-55, considered eight examples of geological and geophysical expenditures. In each example the taxpayer in question was a mineral-interest owner. The IRS asserts that the ruling therefore implied that only mineral-interest owners could incur geological and geophysical expenditures. We disagree. The revenue ruling did not purport to describe all examples of geological and geophysical expenditures. The introductory sentence of the ruling clarified that the ruling governed only "the treatment of geological and geophysical expenditures in the situations described below". Id. at 51.

The IRS cites three additional cases for the proposition that "geological and geophysical expenses" are incurred only by owners of mineral interests. These cases are Standard Oil Co. v. Commissioner, 68 T.C. 325, 327 (1977), aff'd sub nom. Sun Co. & Subs. v. Commissioner, 677 F.2d 294 (3d Cir. 1982), Gates Rubber Co. & Subs. v. Commissioner, 74 T.C. 1456, 1459 (1980), aff'd, 694 F.2d 648 (10th Cir. 1982), and Shell Oil Co. v. Commissioner, 89 T.C. 371, 399 (1987), supplemented by 90 T.C. 747 (1988), rev'd in part and remanded in part, 952 F.2d 885 (5th Cir. 1992). In Standard Oil Co. v. Commissioner, 68 T.C. at 327, the taxpayer (and/or its subsidiaries) incurred expenses to "obtain geological and geophysical information (G&G) relating to the subsurface configurations

underlying the offshore waters".[12] Using the information, the taxpayer's subsidiaries drilled 20 wells from mobile drilling rigs. Id. at 342-343. The Court held in Standard Oil that the costs of drilling the wells were "intangible drilling and development costs" and therefore were deductible under section 1.612-4, Income Tax Regs.[13] Id. at 343-344, 354. Standard Oil referred to information gathered by the owner of mineral interests as "geological and geophysical" information. But it does not suggest that only owners of mineral interests gather "geological and geophysical" information.

In Gates Rubber Co. & Subs. v. Commissioner, 74 T.C. at 1459, the taxpayer's ventures "expended substantial sums on general and detailed seismic surveys in order to gather geological and geophysical (G&G) information upon which to make their decisions regarding which areas to lease and where to drill on any blocks that they were successful in leasing." The Court stated:

---

[12]The opinion stated: "Such expenditures consisted for the most part of the costs of reconnaissance and detailed surveys of the type described in I.T. 4006, 1950-1 C.B. 48." Standard Oil v. Commissioner, 68 T.C. 325, 327 (1977), aff'd sub nom. Sun Co. & Subs. v. Commissioner, 677 F.2d 294 (3d Cir. 1982); see I.T. 4006, 1950-1 C.B. at 48-49 (ruling that the costs of geological and geophysical exploration must be capitalized if property is acquired or retained on the basis of data obtained from the exploration).

[13]Sec. 1.612-4(a), Income Tax Regs., provides:

In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. * * *

The first step in an oil and gas operation, both offshore and onshore, is to collect and interpret geological and geophysical information to determine if the area in question contains subterranean structures which constitute potential traps for accumulations of oil or gas. Such G&G information is generally obtained through general and detailed seismic surveys.

Id. at 1460. Using "geological and geophysical information", the taxpayer's ventures drilled several wells. Id. at 1464-1465. Relying on Standard Oil, Gates Rubber, 74 T.C. at 1473, held that the costs of drilling the wells could be deducted under section 1.612-4, Income Tax Regs. Like Standard Oil, Gates Rubber referred to information collected by an owner of mineral interests as "geological and geophysical" information. But it did not state that only owners of mineral interests can collect "geological and geophysical information".

In Shell Oil Co. v. Commissioner, 89 T.C. at 399, the Court determined the tax treatment of costs it characterized as "G&G exploration expenditures." The Court noted that Rev. Rul. 77-188, supra, was the IRS's published position regarding the tax treatment of "G&G exploration expenditures." Id. The taxpayer was a producer of oil and gas and an owner of mineral interests. However, there was no dispute in Shell Oil over whether costs should be classified as "geological and geophysical" expenses. Thus the opinion did not reach the question of

whether "geological and geophysical" expenses include only expenses incurred by owners of mineral interests.[14]

The IRS next contends that the legislative history of section 167(h) demonstrates that the costs of the surveys are not "geological and geophysical" expenses within the meaning of section 167(h). The IRS's reliance on legislative history is a fallback position. Its main contention is that the plain meaning of the phrase "geological and geophysical expenses"--as informed by the cases and rulings discussed earlier--includes only the expenses of mineral-interest owners. Only to the extent we determine that section 167(h) is ambiguous, the IRS argues, should we consider legislative history.

A statute is ambiguous if it is open to more than one interpretation or if reasonable minds could differ as to its meaning. Carlson v. Commissioner, 116 T.C. 87, 93 (2001); Merkel v. Commissioner, 109 T.C. 463, 468-469 (1997), aff'd, 192 F.3d 844 (9th Cir. 1999); see also Carrieri v. Jobs.com Inc., 393 F.3d 508, 519 (5th Cir. 2004). To the extent that any ambiguity exists, the courts may consider

---

[14]Tax disputes about seismic surveys have not been limited to owners of oil and gas interests. In Texas Instruments, Inc. v. United States, 551 F.2d 599, 608-609 (1977), the U.S. Court of Appeals for the Fifth Circuit considered the tax treatment of the costs incurred by a seismic survey company for creating seismic data that was recorded on magnetic tapes and on film. The taxpayer argued that the costs should be considered the costs of "tangible personal property". Id. at 609. The government argued that the costs were the cost of "intangible personal property", specifically, intangible personal property in the form of information. Id. The Court of Appeals agreed with the taxpayer that the survey costs were the costs of tangible personal property. Id. at 611. The dispute in Texas Instruments did not involve the question of whether the costs at issue were "geological and geophysical" expenses. Therefore the decision has no bearing on the present case.

the legislative history of the statute to determine Congress's intent in enacting the statute. Carrieri, 393 F.3d at 518-519; Carlson v. Commissioner, 116 T.C. at 93; Merkel v. Commissioner, 109 T.C. at 468-469. The IRS contends that the phrase "geological and geophysical expenses" unambiguously means only the expenses of owners of mineral interests. However, this contention is based on the theory that various cases and rulings established "geological and geophysical expenses" as a term of art encompassing only the expenses of mineral-interest owners. As we have explained, we find this theory unpersuasive. In our view the phrase is ambiguous. Therefore, it is permissible to consider the legislative history of section 167(h).

In this Opinion we discuss all of the legislative materials cited by the IRS that preceded the enactment of section 167(h) in the Energy Policy Act of 2005, Pub. L. No. 109-58, sec. 1329, 119 Stat. at 1020.[15] As explained below we conclude that, even if these legislative materials are viewed as reliable indicators of Congress's intent, they do not compel the IRS's interpretations of section 167(h). See Med. Ctr. Pharm. v. Mukasey, 536 F.3d 383, 397 (5th Cir. 2008). We therefore do not need to consider CGGA's argument that none of the legislative

---

[15] We also refer to some preenactment legislative materials not cited by the IRS. Any time we refer to preenactment legislative materials not cited by the IRS, we specifically note that the material was not cited by the IRS.

materials cited by the IRS (with the exception of a 2005 House Ways and Means committee report, H.R. Rept. No. 109-45) is a reliable indicator of congressional intent.[16]  The mere fact that we discuss these legislative materials does not indicate our belief that the materials are reliable indicators of congressional intent.

There are two propositions the IRS seeks to draw from the legislative materials:  (1) Congress intended that the meaning of "geological and geophysical expenses" be informed by the meaning of similar terms used in Rev. Rul. 83-105, supra, and Rev. Rul. 77-188, supra, and (2) more generally Congress intended only mineral-interest owners to benefit from section 167(h).  This second proposition, if true, could support either of the IRS's two text-based arguments, i.e., that (1) the phrase "geological and geophysical expenses" refers only to expenses incurred by taxpayers that own mineral interests or (2) an expense is "paid or incurred in connection with the exploration for, or development of, oil or gas" only when "paid or incurred in connection with" the taxpayer's "exploration for, or development of, oil or gas".  (We referred to these arguments supra pp. 7-10.) With respect to the first text-based argument, if "geological and geophysical expenses" is interpreted to be limited to the expenses of mineral-interest owners,

---

[16]CGGA argues that "the 2005 Committee Report is the only Congressional Committee Report issued prior to enactment of section 167(h) that addresses the substantive provision of the statute and * * * is the only considered and collective Congressional reflection relating to section 167(h), as originally enacted".  CGGA contends that the "remaining sources" cited by the IRS are "unreliable at best".

that interpretation would be consistent with a congressional intent to limit the benefits of section 167(h) to mineral-interest owners. The second text-based argument assumes that only mineral-interest owners incur expenses in connection with exploration and development and therefore only mineral-interest owners can benefit from section 167(h). This would be consistent with a congressional intent to provide the benefits of section 167(h) only to mineral-interest owners.

The legislative materials cited by the IRS begin in 1997. Two bills were introduced that year, one in the House and one in the Senate, that would have allowed a taxpayer to elect to deduct "geological and geophysical expenses incurred in connection with the exploration for, or development of, oil or gas within the United States". National Energy Security Act of 1997, H.R. 1648, 105th Cong., sec. 4 (1997); Domestic Oil and Gas Preservation Act, S. 770, 105th Cong., sec. 2 (1997).[17] The deduction would have been allowed for the year the expense was paid or incurred. H.R. 1648, 105th Cong., sec. 4; S. 770, 105th Cong., sec. 2. This is a difference from section 167(h), which generally requires

_____

[17]We observe that before 1997 at least two other bills had been introduced that would have allowed taxpayers to elect an immediate deduction: the Domestic Oil and Gas Production and Preservation Act, S. 451, 104th Cong., sec. 121 (introduced Feb. 16, 1995), and S. 34, 104th Cong., sec. 1 (introduced Jan. 4, 1995). Senator John Breaux, who introduced S. 34, stated that the bill "would allow oil and gas producers that incur geological and geophysical [G&G] costs to expense those costs rather than capitalize them regardless of whether a will [sic] is producing or dry." 141 Cong. Rec. S227 (daily ed. Jan. 4, 1995) ("[G&G]" as in original). The statement by Senator Breaux, not cited by the IRS, suggests that geological and geophysical costs are incurred by producers. This is different from saying that only producers incur geological and geophysical costs.

that the expense be deducted over two years. A "summary" of the Senate bill was

submitted by Senator Donald Nickles for printing in the Congressional Record.[18]

The summary stated:

> <u>Current law treatment</u>
> G&G costs are not deductible as ordinary and necessary business expenses but are treated as capital expenditures recovered through cost depletion over the life of the field. G&G expenditures allocated to abandoned prospects are deducted upon such abandonment.
> <u>Reasons for change</u>
> These costs are an important and integral part of exploration and production for oil and natural gas. They affect the ability of domestic <u>producers</u> to engage in the exploration and development of our national petroleum reserves. Thus, they are more in the nature of an ordinary and necessary cost of doing business. These costs are similar to research and development costs for other industries. For those industries such costs are not only deductible but a tax credit is available.
> Crude oil imports are at an all-time high which makes the U.S. vulnerable to sharp oil price increases or supply disruptions. Domestic exploration and production must be encouraged now to offset this potential threat to national security and our economy. Allowing current deductibility of G&G costs would increase capital available for domestic exploration and production activity.
> The technical "infrastructure" of the oil services industry, which includes geologists and engineers, has been moving into other industries due to reduced domestic exploration and production.

---

[18]The May 20, 1997 entry in the Congressional Record contains the following statement by Senator Nickles:

Mr. President [i.e., the President of the Senate], I ask unanimous consent that a summary of the bill be printed in the RECORD.

143 Cong. Rec. S4759 (daily ed. May 20, 1997). Unanimous consent appears to have been given because the summary referred to by Senator Nickles is printed immediately below his request to have it printed.

> Stimulating exploration and development activities would help rebuild the critical oil services industry.
>
> Encouraging the industry to use the best technology available and to reduce its environmental footprint are important public policy reasons to clarify that these ordinary and necessary business expenses for the oil and gas industry should be expensed.

143 Cong. Rec. S4759 (daily ed. May 20, 1997) (emphasis added).[19]  The bills failed to pass.  The following year, 1998, Senator Kay Bailey Hutchison introduced the U.S. Energy Economic Growth Act, S. 1929, 105th Cong., sec. 201 (1998), with the same geological-and-geophysical-expenses provision as the 1997 bills.  Senator Hutchison stated:

> [M]y bill makes changes to the tax code that make[] it easier for producers to take full advantage of already existing tax credits. Under these provisions, both geological and geophysical expenditures on domestic production * * * would be allowed to be expensed at the time incurred rather than capitalized over the length of the well.  This election would allow producers more control over their income stream without changing the amount of tax.

144 Cong. Rec. S3146 (daily ed. Apr. 2, 1998) (emphasis added).  Senator Hutchison's bill did not pass.  Further bills were introduced that would have allowed a taxpayer to elect to deduct geological and geophysical expenses in the year the expense was paid or incurred.  These bills include:

---

[19]Our views on the significance of this summary are set forth infra note 30.

- United States Energy Economic Growth Act, S. 325, 106th Cong., sec. 201 (introduced Jan. 28, 1999).[20]

- H.R. 2488, Union Calendar No. 136, Report No. 106-238, 106th Cong., sec. 723 (introduced July 13, 1999, reported out of committee, July 16, 1999).[21]

- Taxpayer Refund Act of 1999, S. 1429, 106th Cong., sec. 1105 (introduced July 26, 1999).

- Marginal Well Preservation Act of 2000, S. 2265, 106th Cong., sec. 3 (introduced Mar. 21, 2000).

- S. 2557, 106th Cong., sec. 803 (introduced May 16, 2000).[22]

- Energy Tax Policy Act of 2001, H.R. 2511, 107th Cong., Union Calendar No. 93, Report No. 107-157, sec. 304 (introduced July 17, 2001; reported out of committee as amended, July 24, 2001).

- S. 1199, 107th Cong., sec. 2 (introduced July 19, 2001).[23]

---

[20] Although the IRS does not cite S. 325, 106th Cong. (1999), the bill is referred to in the statement of Shawn Noonan, which the IRS cites.  See item (4) of list infra pp. 29-30.

[21] Although the IRS does not cite H.R. 2488, the bill is referred to in the statements of Shawn Noonan and Red Cavaney, which the IRS cites.  See items (3) and (4) of list infra pp. 28-30.

[22] Although the IRS does not cite S. 2557, 106th Cong. (2000), the bill is referred to in the statement of Red Cavaney, which the IRS cites.  See item (3) of list infra pp. 28-29.

[23] S. 1199, 106th Cong. (2000), is not cited by the IRS.

- Energy Tax Policy Act of 2003, H.R. 1531, 108th Cong., Union Calendar No. 41, Report No. 108-67, sec. 304 (introduced Apr. 1, 2003; reported out of committee with amendment, Apr. 9, 2003). (This bill provided that geological and geophysical expenses would be deducted over a two-year period beginning on the date the expense was paid or incurred. Id. sec. 304(a).)

- S. 696, 108th Cong., sec. 2 (introduced Mar. 24, 2003).[24]

The IRS points to 10 statements made by various witnesses before Congress favoring the provisions in these bills. Some of the witnesses were from the oil and gas industry. As to these witnesses, the IRS states: "Throughout, the testimony of witnesses was essentially the same; they sought to free up capital for producers by shortening the geological and geophysical cost recovery time for producers and owners of mineral interests." The 10 statements are listed below.

(1) Joseph Mikrut, Tax Legislative Counsel for the Department of the Treasury, Energy Supply and Prices: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways and Means, 107th Cong., Serial No. 107-8, at 8-19 (Mar. 5, 2000). The IRS quotes Mikrut as testifying that "the tax treatment of geological and geophysical costs

---

[24]S. 696, 108th Cong. (2003), is not cited by the IRS.

applied to any taxpayer with an economic interest in a producing property." We were unable to find these exact words in Mikrut's testimony. On a page different from the page cited by the IRS, Mikrut testified: "Certain costs incurred prior to drilling an oil- or gas-producing property are recovered through the depletion deduction. These include costs of acquiring the lease or other interest in the property, and geological and geophysical costs (in advance of actual drilling)." Id. at 12.

(2) William Richardson, Secretary of Energy, Summer Energy Concerns for the American Consumer: Hearing Before the House Comm. on Commerce, 106th Cong., Serial No. 106-136, at 25 (June 28, 2000). Secretary Richardson testified: "We are * * * looking to help independent oil producers test new production technologies, lend a hand to small producers in existing fields, develop some tax credits in G&G expensing marginal wells to help those independent producers." Id. at 26 (so as in original).

(3) Red Cavaney, president and chief executive officer of the American Petroleum Institute, Energy Tax Issues: Hearing Before the Subcomm. on Taxation and IRS Oversight of the S. Comm. on

Finance, 106th Cong., S. Hrg. No. 106-711, at app. 44-51 (July 18, 2000). Cavaney stated that "[o]il and gas exploration companies incur huge up front capital expenditures, including geological and geophysical (G&G) expenses", that "G&G expenses" include costs "incurred to help oil and gas companies locate and identify properties", that "[c]urrently, these costs must be capitalized", and that Congress should pass legislation to permit "the expensing of G&G costs". Id. at 46-47. Cavaney specifically mentioned three bills that would have allowed taxpayers to elect immediate expensing of geological and geophysical costs: H.R. 2488, Union Calendar No. 136, Report No. 106-238, 106th Cong., sec. 723 (reported out of committee July 16, 1999); Marginal Well Preservation Act of 2000, S. 2265, 106th Cong., sec. 3 (introduced Mar. 21, 2000); S. 2557, 106th Cong., sec. 803 (introduced May 16, 2000).

(4) Shawn Noonan, Chairman of the Tax Committee of the Domestic Petroleum Council, Energy Tax Issues: Hearing Before the Subcomm. on Taxation and IRS Oversight of the S. Comm. on Finance, 106 Cong., Hrg. 106-711, at app. 64-66 (July 18, 2000). Noonan stated that the members of his council produced nearly one-

fifth of the natural gas in the United States. <u>Id.</u> at 65. He stated that a "key tax incentive[]" for his members' "industry" was the prospect of being able to elect current-expense treatment of geological and geophysical expenses. <u>Id.</u> Noonan stated that geological and geophysical costs were capitalized under then-current tax law and that the law should be amended to allow the costs to be deducted. <u>Id.</u> at 65-66. Noonan specifically mentioned the following bills that would have provided an election for current-expense treatment of geological and geophysical expenses: Marginal Well Preservation Act of 2000, S. 2265, 106th Cong., sec. 3 (introduced Mar. 21, 2000); United States Energy Economic Growth Act, S. 325, 106th Cong., sec. 201 (introduced Jan. 28, 1999); H.R. 2488, Union Calendar No.136, Report No. 106-238, 106th Cong., sec. 723 (reported out of committee July 16, 1999).

(5) Jerry Jordan, Chairman of the Independent Petroleum Association of America, <u>National Energy Policy: Hearing Before Subcomm. on Energy and Air Quality of the H. Comm. on Energy and Commerce</u>, 107th Cong. Serial No. 107-11, at 70-76 (Feb. 28, 2001). Jordan

stated that independent "producers" need a provision "to allow expensing of geological and geophysical costs." Id. at 74.

(6)    Stephen Layton, Chairman of the Crude Oil Committee of the Independent Petroleum Association of America, National Energy Policy:  Crude Oil and Refined Petroleum Products:  Hearing Before Subcomm. on Energy and Air Quality of the H. Comm. on Energy and Commerce, 107th Cong., Serial No. 107-12, at 9-18 (Mar. 30, 2001).  Layton stated that independent "producers" need a provision "to allow expensing of geological and geophysical costs." Id. at 15.

(7)    Charles MacFarlane on behalf of the American Petroleum Institute, the Domestic Petroleum Council, and the U.S. Oil & Gas Association, Third in Series on Effect of Federal Tax Laws on the Production, Supply, and Conservation of Energy:  Hearing Before the Subcomm. on Select Revenue Measures of the H. Comm. on Ways and Means, 107th Cong., Serial No. 107-25, at 42-50 (June 13, 2001).  McFarlane stated that the capital available to "oil and gas companies" would be

increased by "expensing of geological and geophysical (G&G) costs". Id. at 45.[25]

(8)   Gina Sewell, Chairman of the Tax Committee of the Domestic Petroleum Council, The Role of Tax Incentives in Addressing Rural Energy Needs and Conservation:  Hearing Before the S. Comm. on Finance, 107th Cong. Hrg. 107-192, at 33-39 (Aug. 24, 2001). Sewell testified about the importance to the 22 largest exploration and production companies of allowing geological and geophysical costs to be deducted currently.  Id. at 33.

(9)   Red Cavaney, president and chief executive officer of the American Petroleum Institute, Oil Supply and Prices:  Hearing Before the S. Comm. on Energy and Natural Resources, 108th Cong., Hrg. No. 108-3, at 17-22 (Feb. 13, 2003).  Cavaney stated that he favored "tax

---

[25] In July 2001, the Subcommittees on Oversight and Select Revenue Measures of the House Ways & Means Committee held a hearing "on the nature and cost of complexity in the tax code and the options for tax simplification."  House Ways & Means Committee, Advisory No. OV-5 (July 10, 2001).  The chief of staff of the Joint Committee on Taxation testified at the hearing:

> The Joint Committee staff recommends that taxpayers should be permitted immediate expensing of geological and geophysical costs.  The recommendation would reduce complexity by eliminating the need to allocate such expenses to various properties and by eliminating the need to make factual determinations relating to the properties, such as what constitutes an area of interest and when a property is abandoned.

Lindy Paull, First in Series in Tax Code Simplification 31-32, Serial, No. 107-40, July 17, 2001.  While this statement suggests that geological and geophysical costs are incurred by taxpayers who own mineral interests, it does not mean that only such taxpayers incur geological and geophysical costs.  (The IRS does not cite Paull's testimony.)

measures such as the expensing of geological and geophysical costs." Id. at 22.

(10)    Robert Best, vice chairman of the American Gas Association, Natural Gas Supply and Prices:  Hearing Before the S. Comm. on Energy and Natural Resources, 108th Cong. Hrg. 108-9, at 30-35 (Feb. 25, 2003). Best favored "expensing geological and geophysical costs in the year incurred." Id. at 34.

The final set of legislative materials cited by the IRS is from 2005, the year that section 167(h) was added to the Internal Revenue Code by the Energy Policy Act of 2005.[26]  A bill containing a provision identical to section 167(h)(1), H.R. 1541, 109th Cong. (2005), had been approved by the House Ways and Means Committee on April 18, 2005.  H.R. 1541, Enhanced Energy Infrastructure and Technology Tax Act of 2005, 109th Cong., sec. 205(a) (2005); H.R. Rept. No. 109-45, supra at 9.  The House committee issued Rept. No. 109-45, supra, recommending that the House approve the bill.  Id. at 1.  The House committee report described the preexisting law as follows:  "Geological and geophysical

---

[26]The IRS cites two of the committee reports discussed in this paragraph, specifically H.R. Rept. No. 109-45 (2005), and Joint Committee on Taxation, Description and Technical Explanation of the Conference Agreement of H.R. 6, Title XIII, the "Energy Tax Incentives Act of 2005", JCX-60-05 (July 28, 2005) (hereinafter "JCX-60-05").  As for the other legislative materials discussed in this paragraph, some have been cited by the IRS; others have been referred to by the Court to explain the interrelationship of the various amendments and committee reports.

expenditures ('G&G costs') are costs incurred by a taxpayer for the purpose of obtaining and accumulating data that will serve as the basis for the acquisition and retention of mineral properties by taxpayers exploring for minerals." Id. at 34.[27]

Referring to Rev. Rul. 77-188, supra, and Rev. Rul. 83-105, supra, the House committee report stated: "IRS administrative rulings have provided further guidance regarding the definition and proper tax treatment of G&G costs." H.R. Rept. No. 109-45, at 34. As "[r]easons for [c]hange" the report stated:

> The Committee believes that substantial simplification for taxpayers, significant gains in taxpayer compliance, and reductions in administrative cost can be obtained by establishing a clear rule that all geological and geophysical costs may be amortized over two years, including the basis of abandoned property.
> The Committee recognizes that, on average, a two-year amortization period accelerates recovery of geological and geophysical expenses. The Committee believes that more rapid recovery of such expenses will foster increased exploration for new sources of supply.

Id. at 36. The House did not vote on H.R. 1541. Instead, the House approved H.R. 6, the Energy Policy Act of 2005, a provision of which was also identical to the provision enacted as section 167(h)(1) of the Internal Revenue Code. H.R. 6, 109th Cong., sec. 1315(a) (2005); 151 Cong. Rec. H2449-H2450 (daily ed. Apr. 21, 2005) (House vote on H.R. 6). H.R. 6 was received by the Senate on April 26,

---

[27]Our views on the significance of this statement are set forth infra note 30.

2005. See H.R. 6, tit. II, 109th Cong., Calendar No. 124 (2005), at 1. The Senate did not approve H.R. 6 in the form that had been approved by the House. Instead, the Senate approved an amended version of H.R. 6 (on June 28, 2005) that did not contain the provision regarding geological and geophysical expenses. 151 Cong. Rec. S7477 (daily ed. June 28, 2005) (Senate vote on amended version of H.R. 6); see Staff of J. Comm. on Taxation, Comparison of Title XIII of H.R. 6, the "Enhanced Energy Infrastructure and Technology Tax Act of 2005" as passed by the House of Representatives and Title XV of H.R. 6, the "Energy Policy Tax Incentives Act of 2005" as amended by the Senate, JCX-52-05 at 27 (J. Comm. Print 2005). The House disagreed with the Senate's amendments to H.R. 6 and referred H.R. 6 to a conference committee. 151 Cong. Rec. H5772 (daily ed. July 13, 2005). The conference committee issued a report recommending a compromise proposal. H.R. Conf. Rept. No. 109-190, at 1 (2005), 2005 U.S.C.C.A.N. 448. The compromise proposal (which was printed in the conference committee's report) contained the section-167(h) provision. Id. at 433-434, 2005 U.S.C.C.A.N. at 448 (section 1329). The provision was similar to the provisions in H.R. 1541, the bill that had been approved by the House Ways and

Means Committee, and in H.R. 6, the bill that had been approved by the House.[28]

Appended to the conference committee's report was a "Joint Explanatory

Statement" by "The Managers on the part of the House and Senate at the

conference on the disagreeing votes of the two Houses on the amendment of the

Senate to the bill H.R. 6". Id. at 561, 2005 U.S.C.C.A.N. at 448. The statement

described itself as a submission "to the House and the Senate in explanation of the

effect of the action agreed upon by the Managers and recommended in the

accompanying conference report". Id. However, the statement did not discuss any

particular provision of the compromise proposal. Id. at 561-563, 2005

U.S.C.C.A.N. at 448-451. As the House considered its vote on the compromise

proposal recommended by the conference committee, Representative William

Thomas (the chairman of the House Ways & Means Committee and a member of

the conference committee) told the House that no "normal" statement of the

managers of the conference committee had been prepared and that consequently a

report of the Joint Committee on Taxation, JCX-60-05, should be considered the

[28]H.R. 1541, 109th Cong., sec. 205(a), (2005), would have amended the Internal Revenue Code to add a provision identical to the provision later enacted as sec. 167(h)(1). H.R. 1541, sec. 205(a). It also would have amended the Internal Revenue Code to add "rules" similar to the provisions later enacted as sec. 167(h)(2), (3), and (4). In these respects, the provisions of H.R. 1541 were identical to the provisions of H.R. 6. Compare H.R. 1541, sec. 205(a), with H.R. 6, sec. 1315(a).

statement of the managers of the conference committee.  Representative Thomas's statement to this effect was as follows:

> Mr. Speaker, the need to complete this comprehensive energy bill leads us to consider it without the normal accompanying statement of managers used to clarify and enhance understanding of the legislative text.  Our colleagues, the chairman of the Committee on Finance and the ranking minority member of that committee, agree with me that those who follow tax legislation can and should use the Joint Committee on Taxation's publication, "Description and Technical Explanation of the Conference Agreement on H.R. 6, Title XIII, Energy Tax Incentives Act of 2005, JCX-60-05," as the functional equivalent of a statement of managers for the purposes of completing their understanding of what the tax incentives provide.

151 Cong. Rec. H6953 (daily ed. July 28, 2005).  JCX-60-05 was issued on the same day that Representative Thomas stated that it should be considered the statement of the managers of the conference committee--July 28, 2005.  JCX-60-05, at 55, described the preexisting law as follows:  "Geological and geophysical expenditures ('G&G costs') are costs incurred by a taxpayer for the purpose of obtaining and accumulating data that will serve as the basis for the acquisition and retention of mineral properties by taxpayers exploring for minerals."[29]  Referring to Rev. Rul. 77-188, supra, and Rev. Rul 83-105, supra, JCX-60-05, at 55, stated: "IRS administrative rulings have provided further guidance regarding the definition and proper tax treatment of G&G costs."  In these respects--and in its

---

[29]Our views on the significance of this statement are set forth infra note 30.

statements about geological and geophysical expenses generally--the wording in JCX-60-05 is identical to that of H.R. Rept. No. 109-45, supra, except that JCX-60-05 did not contain the two paragraphs in H.R. Rept. No. 109-45, supra, regarding "[r]easons for [c]hange". (As a general matter, the statements of the managers of the conference committee do not discuss the reasons for changing current law.) Later in the day on which Representative Thomas stated that JCX-60-05 should be considered the statement of the managers of the conference committee (i.e., later on July 28, 2005), the House passed the compromise proposal. 119 Stat. at 1143; 151 Cong. Rec. H6972-H6973 (daily ed. July 28, 2005). The next day, July 29, 2005, the Senate passed the compromise proposal. 119 Stat. at 1143; 151 Cong. Rec. S9374 (daily ed. July 29, 2005). On August 8, 2005, the President signed the bill into law. 119 Stat. at 1143.

CGGA contends that JCX-60-05 was "prepared and issued after the adoption of the statute" and therefore does not qualify as legislative history of section 167(h). However, JCX-60-05, which was dated July 28, 2005, was referred to by Representative Thomas on July 28, 2005, shortly before the House passed the compromise proposal on July 28, 2005, and the Senate voted on the compromise proposal on July 29, 2005.

We agree with the IRS that the legislative materials suggest that there is a link between the meaning of "geological and geophysical expenses" in section 167(h) (enacted in 2005) and similar phrases in Rev. Rul. 77-188, supra, and Rev. Rul 83-105, supra. (Rev. Rul. 77-188, supra, used the phrase "geological and geophysical exploration expenditures", and Rev. Rul. 83-105, supra, used the phrase "geological and geophysical expenditures".) However, as discussed above, it does not appear to us that these rulings define those terms as including only the costs of taxpayers owning mineral interests. At most, the references to Rev. Rul. 77-188, supra, and Rev. Rul. 83-105, supra, in the legislative materials suggest that Congress intended the two-year deduction period in section 167(h) to apply to owners of mineral interests. And in our view none of the legislative materials cited by the IRS (including but not limited to the portions of the legislative materials referring to Rev. Rul. 77-188, supra, and Rev. Rul. 83-105, supra) goes further than this limited suggestion.[30]

---

[30]Here we briefly explain our view that the legislative materials cited by the IRS do not support the idea that Congress intended sec. 167(h) to apply exclusively to owners of mineral interests.

H.R. Rept. No. 109-45, supra at 34 (the Ways and Means Committee report recommending that the House adopt H.R. 1541), and JCX-60-05, at 59 (the Joint Committee on Taxation's report), state that "[g]eological and geophysical expenditures * * * are costs incurred by a taxpayer for the purpose of obtaining and accumulating data that will serve as the basis for the acquisition and retention of mineral properties by taxpayers exploring for minerals." The IRS contends that the term "taxpayers exploring for minerals" refers to the same "taxpayer" who is described as incurring geological and geophysical expenses and that therefore only taxpayers who are exploring for minerals were considered by the reports to incur geological and geophysical expenses. We disagree. The taxpayers exploring for minerals could be different from the "taxpayer" who incurred the geological and geophysical expenses.

The IRS contends that the summary of S.770, 105th Cong. (1997), submitted by Senator Nickles

(continued...)

Accepting that Congress intended section 167(h) to apply to owners of mineral interests, this does not dispose of the question of whether nonowners are governed by section 167(h).  Congress's principal concern when it enacted section 167(h) may have been owners.  But that does not mean that section 167(h) covers owners and no other types of taxpayers.  A law can achieve effects different than those that Congress principally intended to achieve in enacting the law.  As the Supreme Court held in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998), "[i]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  Id. at 79.  This principle is illustrated by Med. Ctr. Pharm., 536 F.3d at 397.  In that case the Court of Appeals for the Fifth Circuit interpreted a provision of the Federal Food Drug and

---

[30](...continued)

demonstrates that geological and geophysical costs are costs incurred only by oil and gas producers.  According to the summary, geological and geophysical costs are "recovered" by a taxpayer "through cost depletion over the life of the field".  This suggests that the taxpayer owns a "field" or other property.  In context, however, it appears that the statement focused on the tax treatment of mineral-interest owners.  For example, the summary alludes to the problems faced by "domestic producers".  The summary does not discuss the tax treatment of other types of taxpayers.  It does not directly discuss the question of whether geological and geophysical costs are incurred only by mineral-interest owners.

As for the remaining legislative materials cited by the IRS, a subset of the materials states that geological and geophysical costs are the types of costs incurred by mineral-interest owners, or that the legislative proposals to treat geological and geophysical costs favorably would benefit mineral-interest owners.  The subset to which we refer consists of the 1998 statement by Senator Hutchison in the Congressional Record, the statement by Treasury's Mikrut, the testimony by Secretary of Energy Richardson, the 2000 statement by Cavaney, the statement by Jordan, the statement by Layton, the statement by MacFarlane, the testimony of Sewell, the 2003 statement by Cavaney, and the statement by Best.  However, these materials do not state that geological and geophysical costs are incurred only by mineral-interest owners, or that only mineral-interest owners would benefit from the legislative proposals.  Noonan's statement implies that geological and geophysical costs are incurred only by mineral-interest owners.  (He said, without qualification, that geological and geophysical costs are capitalized.)  However, Noonan did not directly address the question of whether geological and geophysical costs can be incurred by taxpayers other than mineral-interest owners.  Furthermore, Noonan seemed to be focused on the taxation of oil and gas producers.  His statement does not appear to be a reliable guide to his views on the taxation of other types of taxpayers.

Cosmetic Act of 1938 (the "FDCA") that required FDA approval for any "new drug". Id. at 388 n.4. The Court of Appeals held that drugs created by compounding[31] by pharmacists were "new drugs" for which FDA approval is required under the FDCA. Id. at 406. The Court of Appeals rejected the argument that the legislative history of the FDCA demonstrated that the FDCA was intended to regulate only nonpharmacist manufacturers. Id. at 397. According to the court, the legislative history indicated that some supporters of the law--both in and out of Congress--intended that the law regulate the manufacturing of drugs by nonpharmacists. Id. In the court's view, the legislative history established "only that their speakers were concerned about regulating drug manufacturing; they do not express any plain intent to refrain from further regulating the drugs created through pharmacy compounding." Id. at 397-398 (citing Oncale, 523 U.S. at 79). By analogy, the legislative material involving section 167(h) show that its supporters were concerned about mineral-interest owners; the material did not show they intended the provision's effect to be limited to mineral-interest owners. Additionally, Congress did not expressly enact an ownership requirement in section 167(h). If Congress had intended such a requirement, it could have

---

[31] As the Court of Appeals explained, "[d]rug compounding is the process by which a pharmacist combines or alters drug ingredients according to a doctor's prescription to create a medication to meet the unique needs of an individual human or animal patient." Med. Ctr. Pharm. v. Mukasey, 536 F.3d 383, 387 (5th Cir. 2008).

enacted one.[32]  The absence of such a limitation, viewed in conjunction with the

_____

[32]The IRS also contends that sec. 167(h) extends only to taxpayers who "have an economic interest in property."  For this proposition the IRS relies on the "economic-interest" concept of natural-resources taxation.  The IRS explains its argument as follows:

> In determining the plain meaning of the language of section 167(h) * * * one must take into consideration that the underlying issues addressed by the statute pertain to unique rules governing the taxation of natural resources.  A key concept in natural resources taxation is identifying who owns the economic interest in the property.  Palmer v. Bender, 287 U.S. 551 (1933).  An economic interest has been defined as being "possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place * * * and secures, by any form of legal relationship, income derived from the extraction of the mineral * * * to which he must look for a return of his capital."  Treas. Reg. § 1.611-1(b).  [Fn. ref. omitted.]

The economic-interest concept is a prominent feature of natural-resources taxation, determining, for example, which taxpayer is entitled to a depletion allowance:

> The economic interest concept has a long and varied history, and is central to the field of oil and gas taxation.  The determination of whether a taxpayer has an economic interest or some lesser interest such as an economic advantage affects the right to depletion, the question of to whom income from mineral production is taxable, and the character of income from the disposition of a mineral property as capital gain versus ordinary income.  The concept of an economic interest was developed because the traditional notion of legal title to property was not adequate to determine which parties should reap the various incentives built into oil and gas tax law.

Owen L. Anderson, et al., Hemingway Oil and Gas Law and Taxation 502-503 (4th ed. 2004) (fn. ref. omitted).  The allowance for depletion is found in sec. 611(a), which provides:  "In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary."  A regulation limits the depletion allowance to "the owner of an economic interest in mineral deposits or standing timber."  Sec. 1.611-1(b)(1), Income Tax Regs.  By contrast, no regulation (and no statute) attaches an economic-interest limitation the two-year deduction for certain geological and geophysical expenses under sec. 167(h).

The regulation that limits the depletion-allowance deduction to owners of economic interests was promulgated in 1960.  Even before 1960, caselaw held that the depletion allowance was limited to owners of economic interests.  See Palmer v. Bender, 287 U.S. 551, 557 (1933).  By analogy, it might be argued that the two-year deduction under sec. 167(h) for certain geological and geophysical expenses should be judicially interpreted to cover only owners of economic interests.  If this is the IRS's argument, we think the argument lacks merit.  Limiting the depletion allowance to owners of economic interests was consistent with the function of the depletion allowance and the meaning of the word "depletion" itself.  The depletion allowance recognizes that the owner of land loses something when oil is extracted from the land and sold.  Commissioner v. Sw. Expl. Co., 350 U.S. 308, 312 (1956) ("An allowance for depletion * * * is based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit."); Helvering v. Bankline Oil Co., 303 U.S. 362, 366-67 (1938) ("The deduction * * * is permitted in recognition of the fact that the mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production." (citing United States v. Ludey, 274 U.S. 295, 302 (1927))); Ludey, 274 U.S. at 302 ("The depletion charge permitted as a deduction from the gross income in determining the taxable income of mines for any year represents the reduction in the mineral contents of the reserves from which the product is taken.  The reserves are recognized as wasting assets.  The depletion effected by operation is likened to the using up of raw material in making the product of a manufacturing establishment.").

(continued...)

equivocal nature of the legislative materials, convinces us that "geological and geophysical expenses" are not limited to taxpayers that own mineral interests.

In arriving at this conclusion, we have considered and rejected the IRS's argument that a 2006 amendment to section 167(h)--codified at section 167(h)(5)-- indirectly shows that Congress had intended the treatment of geological and geophysical expenses under section 167(h) to be confined to owners of mineral interests. As noted before, section 167(h), as enacted in 2005, provided for a two-year deduction period for geological and geophysical expenses. In 2006, Congress amended section 167(h) to include a new provision, section 167(h)(5), which replaced the two-year period with a five-year period "[i]n the case of a major

---

[32](...continued)
    The economic-interest concept in the pre-1960 caselaw allowed taxpayers to receive an offset for the loss of the oil extracted from the oil reserve. The offset was shared among those holding an economic interest in the oil reserve. See Palmer v. Bender, 287 U.S. 557, 558 (1933). An economic-interest concept is connoted by the word "depletion" in the statutory provision granting a depletion allowance. The economic-interest concept is not so connoted by the words "geological and geophysical expenses".
    We observe that wording similar to an economic-interest limitation is also found in a regulation that interprets sec. 263(c). Section 263(c) provides an optional deduction for "intangible drilling and development costs in the case of oil and gas wells". The corresponding regulation, sec. 1.612-4, Income Tax Regs. (1965), provides:

> In accordance with the provision of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense.

(Emphasis added.) No similar limitation is found in the regulations interpreting sec. 167(h) or in the words of sec. 167(h) itself. We do not interpret sec. 167(h) to impose such a limitation.

integrated oil company."[33]  Tax Increase Prevention and Reconciliation Act of

2005, Pub. L. No. 109-222, sec. 503(a), 120 Stat. at 354 (2006).  A "major

integrated oil company" was defined in section 167(h)(5)(B) as "a producer of

crude oil" that had more than $1 billion in gross receipts and met other criteria.

The IRS contends that Congress's enactment of this special five-year rule for

certain producers with over $1 billion in receipts shows that the 2006 Congress

must have thought that the two-year period in section 167(h) generally applied

only to producers.  In our view, the 2006 amendment gives rise to the opposite

inference.  The 2006 amendment supports the notion that when Congress intends a

special provision to cover only "producers", it expressly says so.  Congress

specified that only "producers" were subject to the five-year deduction period for

geological and geophysical costs.  Sec. 167(h)(5)(B) (defining "major integrated

oil company" as "a producer of crude oil" meeting certain requirements).  The

two-year deduction period under section 167 was enacted in 2005 with no

specification that it be available only to a "producer".  If Congress intended to

limit its availability to producers (or to mineral-interest owners), it could have

enacted such a limitation.

---

[33]Although this change was effective for amounts paid or incurred after May 17, 2006, and although CGGA's 2006 tax year is at issue in this case, the change does not directly affect the tax treatment of the survey costs.  CGGA is not a major integrated oil company.  Thus, even if, as we hold, its survey costs are geological and geophysical expenses, the costs are not deducted over seven years but only two years.

We hold that "geological and geophysical expenses" are not confined to owners of mineral interests. The parties stipulated that CGGA's expenses "were incurred for geophysical activities". Thus, it follows that the expenses that CGGA incurred for conducting the surveys are "geological and geophysical expenses".

2. <u>The survey expenses were "incurred in connection with the exploration for, or development of, oil or gas within the United States".</u>

We now turn to the question of whether the survey expenses incurred by CGGA were "incurred in connection with the exploration for, or development of, oil or gas." The IRS's argument here is that the exploration to which the survey costs relate was the activity of CGGA's customers, not CGGA. In response to this theory, CGGA makes two alternative responses: (1) that the exploration to which its survey costs relate is the activity of CGGA, not just its customers, and (2) that even if the exploration was not the activity of CGGA, the survey costs were nonetheless "incurred in connection with" the exploration. It does not appear necessary to parse the individual merits of CGGA's two responses. We hold that on the stipulated facts the survey expenses were "incurred in connection with" the oil and gas exploration to which the costs relate. The surveying done by CGGA was integral to the process of finding oil and gas deposits. CGGA conducted the surveys, which detected or suggested the presence of oil and gas, in order to

license the resulting data to customers that used the data to drill for oil and gas. Without CGGA's performing the surveys, CGGA's customers would have had to do the surveys themselves. The relationship between the surveys and oil and gas exploration is sufficient for us to conclude that the costs of the surveys borne by CGGA were incurred in connection with the exploration for, or development of, oil and gas.

### Conclusion

We will grant CGGA's motion for summary judgment. The IRS's motion for summary judgment, which urges the ultimate conclusion that the survey expenses are not deductible under section 167(h), is based on the same reasons given by the IRS in opposition to CGGA's motion for summary judgment. Because we find these reasons unpersuasive, we will deny the IRS's motion for summary judgment.

We have considered all arguments made by the parties, and to the extent that we have not discussed them, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

An appropriate order will be issued granting petitioner's motion for summary judgment and denying respondent's cross-motion for summary judgment, and decision will be entered under Tax Court Rule of Practice & Procedure 155.